TERRE HAUTE, INDIANAPOLIS AND EASTERN TRACTION COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

INDIANAPOLIS, CRAWFORDSVILLE AND DANVILLE ELECTRIC RAILWAY COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

TERRE HAUTE TRACTION AND LIGHT COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

INDIANAPOLIS AND NORTHWESTERN TRACTION COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 33858–33861.   Promulgated September 29, 1931.

*A. E. James, Esq.*, and *Harry A. Fellows, Esq.*, for the petitioners.
*W. Frank Gibbs, Esq.*, for the respondent.

204

Love: The principal question involved in these proceedings is whether the four petitioners were affiliated and, therefore, entitled to file consolidated returns of income for the calendar years 1922 and 1923. The applicable statute is section 240 (c) of the Revenue Act of 1921, which provides as follows:

For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests.

The respondent determined that petitioners were not affiliated within the meaning of the statute. Petitioners contend that they come within section 240 (c) (1), *supra*. They do not claim affiliation under section 240 (c) (2).

A brief outline of the salient facts set forth in our findings is that the parent company owned directly all of the common stock of the three subsidiaries, which amounted to 85 per cent of the total outstanding capital stock of the Northwestern Traction and 66⅔ per cent of the total outstanding capital stock of each of the other two. The balance of the outstanding capital stock of the three subsidiaries consisted of preferred stock which had equal voting rights

with every other share. A small percentage of this preferred stock, namely, 18.16 per cent in the case of the Light Company, 9.93 per cent in the case of the Northwestern Traction, and 3.40 per cent in the case of the Electric Railway, was owned by common and preferred stockholders of the parent company. The greater percentage, namely, 57.28 per cent in the case of the Light Company, 40.55 per cent in the case of the Northwestern Traction, and 70 per cent in the case of the Electric Railway, was owned by interests who owned no stock whatever in any of the other three companies. The balance of the preferred, namely, 24.56 per cent in the case of the Light Company, 49.52 per cent in the case of the Northwestern Traction, and 26.60 per cent in the case of the Electric Railway, was owned by stockholders who held no stock in the parent company, but who did own some preferred stock in two or more of the subsidiaries. The parent company's stock was owned principally by interests who owned no stock whatever in any of the three subsidiaries. Only 6.29 per cent of the common and 7.24 per cent of the preferred stock of the parent company was owned by stockholders who owned preferred stock in one or more of the subsidiaries. The parent company voted by proxy about one-half of the preferred stock of the subsidiaries and about 99 per cent of all the stock that was voted. Each of the subsidiaries leased all of their properties to the parent company for a period of 999 years, during which period the latter, as part of the rental, promised to pay a fixed dividend to the holders of the preferred stock. With but few exceptions the board of directors and officers of the four petitioners were made up and consisted of the same persons. The four corporations were operated as a single economic unit.

The question of affiliation has been before this Board and the courts many times. At present there have been at least 32 court cases (exclusive of the Federal District Courts), and affiliation was allowed in 14 cases and denied in 18.

Petitioners practically concede that an ownership of 66⅔ per cent and 85 per cent, respectively, of the outstanding stock is not sufficient, by itself alone, to justify holding the four companies affiliated, for the reason that such percentages do not meet the requirement of " substantially all " in the statute. With this proposition we agree. See *Commissioner* v. *Adolph Hirsch & Co.*, 30 Fed. (2d) 645; *United States* v. *Cleveland, P. & E. R. Co.*, 42 Fed. (2d) 413; and *Denunzio Fruit Co.* v. *Commissioner*, 49 Fed. (2d) 41. In the second case *supra* the Sixth Circuit said: " This stock, however, constituted only 77 per cent to 84 per cent of the total issue, which cannot be deemed ' substantially all ' * * *."

Petitioners' real contentions may all be condensed and restated as one ultimate contention, namely, that during the taxable years in question *the parent company controlled through closely affiliated interests all of the preferred stock of the subsidiaries,* and, since it owned all the common stock, it owned directly or controlled through closely affiliated interests, not only "substantially all," but 100 per cent of all the stock of all the subsidiaries. We will direct our consideration to petitioners' ultimate contention, for, if that be true, it would follow unquestionably that petitioners were affiliated within the meaning of the statute and entitled to file consolidated returns.

Did the parent company in the instant proceedings control through closely affiliated interests the preferred stock of the subsidiaries? Petitioners, in their brief, argue that the facts present twelve major reasons why they should be held affiliated. Eleven of these are in substance a restatement of the facts and relate to (1) direct stock ownership by the parent company, which we discussed in paragraph four above; (2) a voting by the parent company of approximately 99 per cent of all the stock that was voted; (3) the election of interlocking directorates; (4) acquiescence by preferred stockholders in the parent company's management; (5) the selection of directors of the subsidiaries who were either associated with the parent company or were agreeable or useful to it; (6) the existence of the same officers in all the companies; (7) the ownership by stockholders of the parent company of the relatively small percentage of the preferred stock of the subsidiaries; (8) the ownership of preferred stock in two or more of the subsidiaries by persons who held no stock in the parent company; (9) the fact that if all the stock of the subsidiaries which was owned directly by the parent company, or by stockholders of the parent company, or by persons who owned stock in two or more of the subsidiaries but no stock in the parent company, were added together as representing ownership by the parent company or by interests closely affiliated therewith, the total percentage of shares so owned or controlled would amount to 80.9 per cent of the total outstanding shares of the Light Company, 93.9 per cent of the total outstanding shares of the Northwestern Traction, and 76.6 per cent of the total outstanding shares of the Electric Railway; (10) the provision in the several leases whereby all the physical properties and in effect the management of the businesses of the subsidiaries were turned over to the parent company for a period of 999 years, and wherein the respective lessor covenanted with the lessee to do certain specific things such as maintaining its corporate organization, holding all necessary meetings, electing direc-

tors and officers, making and keeping records, reports and returns required by law, and doing all acts as shall be proper for the full protection, preservation and full enjoyment by the lessee of all the leased properties, and *not* to do certain specific things such as not to issue any additional stock nor to authorize the creation of any mortgage upon the leased properties, nor create any debts, become a party to any contracts or incur any obligations of any kind whatsoever during the term of the lease except as therein authorized; and (11) the operation of all four companies as one economic unit.

The facts upon which the above reasons are based do not, in our opinion, bring the four petitioners within the affiliation provision of the statute. Regarding reasons (1), (7), (8) and (9), we do not believe that, because a nonstockholder of the parent company happens to own stock in two or more of the subsidiaries, that fact makes such a person a closely affiliated interest of the parent company. And even if it did, it would not follow that the parent controlled such stock. *Block Street Wharf & Warehouse Co.*, 2 B. T. A. 183. In a few cases we have held that a stockholder of a parent company who also owned stock in a subsidiary was a closely affiliated interest of the parent, through whom the parent controlled the subsidiary stock so held. See *Hamilton & Chambers Co.*, 1 B. T. A. 694; and *Boker Cutlery & Hardware Co.*, 12 B. T. A. 1405. But in the instant case the percentage of subsidiary stock held by stockholders of the parent company was so small that when added to the subsidiary stock directly owned by the parent company, it amounted to only 72.7 per cent in the case of the Light Company, 86.5 per cent in the case of the Northwestern Traction, and 67.8 per cent in the case of the Electric Railway. Such percentages do not constitute " substantially all." *Commissioner* v. *Hirsch & Co., supra; United States* v. *Cleveland, P. & E. R. Co., supra;* and *Denunzio Fruit Co.* v. *Commissioner, supra.* Regarding reasons (2) and (4), the weight of opinion is that acquiescence on the part of the minority does not prove control of their stock by the majority. *Commissioner* v. *Hirsch & Co., supra; Commissioner* v. *Richfield Oil Co.*, 42 Fed. (2d) 360; *Ground Gripper Shoe Co.*, 21 B. T. A. 646; *Burnet* v. *Bank of Italy*, 46 Fed. (2d) 629; certiorari denied, 283 U. S. 846; and *Commissioner* v. *City Button Works*, 49 Fed. (2d) 705. In *Continental Products Co.*, 20 B. T. A. 818, we said:

It is true that each year the Sulzberger Products Co. executed proxies to officers of the Cattle Co. and/or the Brazil Railway Co. This, however, is not the control required by the statute. *Tunnel Railroad of St. Louis et al.*, 4 B. T. A. 596; *Central Auto Equipment Co.*, 7 B. T. A. 1068; *Empire Safe Deposit Co., supra; News Publishing Co.* v. *Blair, supra.* The Sulzberger Co. might, at any time, have asserted its right to vote its stock and it could not

have been prevented from so doing.   As stated in *Tunnel Railroad of St. Louis*, *supra*, "the right of a proxy is not a relinquishment by the donor of any of the rights of ownership or control."

The test of the statute requiring affiliation is ownership or control of substantially all the *stock*, and not such factors as emphasized in petitioners' reasons (3), (5), (6) and (11).   See *Madera Yosemite Big Tree Auto Co.* v. *United States*, 49 Fed. (2d) 672.   And neither does management of the business referred to in reason (10) amount to control of the stock.   *Commissioner* v. *Hirsch & Co., supra.*

The twelfth and principal reason advanced by petitioners as a ground for granting affiliation is that because the parent company in its leases with the subsidiaries had agreed to pay the preferred stockholders of the subsidiaries a fixed annual dividend on their preferred stock, such promise or guarantee tied the interest of those stockholders to itself and to its own property rather than to their separate interests as stockholders of the respective subsidiary companies; that regardless of the financial success of the subsidiary companies the parent company so long as the lease endured guaranteed the fixed annual income of the preferred stockholders of all the subsidiaries; that such stockholders look solely for their dividend to the parent company; and that, therefore, such preferred stockholders should be regarded as closely affiliated interests of the parent company, from which petitioners contend it follows that the parent company controlled all such preferred stock, and since it owned all the common stock, it owned or controlled all of the outstanding stock of all the subsidiaries.

The foregoing reason is similar in principle to reasons (8) and (9), which we have already considered and held insufficient to warrant the allowance of affiliation.   It is, however, much broader in that it involves all of the preferred stockholders instead of only those who owned stock in two or more of the subsidiaries but no stock in the parent.   But even if we were to hold such preferred stockholders as closely affiliated interests of the parent, we fail to see how it would follow from such a holding that the parent controlled the preferred stock.   As we said in *Block Street Wharf & Warehouse Co., supra*, "A tail does not necessarily control a dog because closely affiliated with it."   And again in *Ground Gripper Shoe Co., supra*, " Undoubtedly, all of the stockholders of the Ground Gripper Stores, Inc., had the interest of profits and successful operation in common.   But this did not constitute control of substantially all of the stock  *  *  *."   The facts in the instant proceedings present a strong case of what might be termed an economic affiliation.   The properties of all the corporations were operated as a single enterprise and by substantially the same individuals as officers

and directors of the separate companies. But Congress has not made this the test for affiliation under the statute. It is the ownership or control of substantially all the stock that governs, and it is that requirement that we find lacking here. Petitioners have placed considerable reliance upon our decision in *Hartford & Connecticut Western Railroad Co.*, 2 B. T. A. 211. We followed that decision in *Mahoning Coal Railroad Co.*, 4 B. T. A. 923, but our decision in the latter case was in effect reversed by the Sixth Circuit in *United States* v. *Mahoning Coal Railroad Co.*, 51 Fed. (2d) 208. The case most nearly in point here as to facts is that of *United States* v. *Cleveland, P. & E. R. Co.*, *supra*. The court in that case made a most thorough study of the question, both from the legislative and judicial standpoint, and, after a full and able discussion thereof, concluded with the following remarks:

After an intensive study of the history of Sec. 240 (b) of the Act of 1918 and the conflicting interpretations which have been given it, we have arrived at the following conclusions: While the underlying purpose was to incorporate the departmental regulation purporting to tax as an economic unit any group of companies so operated as to make arbitrary apportionment of income possible, nevertheless, Congress made determinative not actual control of the related companies, or of the subsidiary by the parent company, but the substantial *ownership* or *control* of their *stock*, or of the *stock* of the subsidiary by the parent company. Under a reasonable interpretation of the statute, the aforesaid underlying purpose cannot be given full effect, although, of course, the elimination, in subsequent Acts, of the alternative of " control" would not affect the interpretation to be given to the Act of 1918.

Applying these conclusions to the case at bar: we find that the two corporations, alleged to have been affiliated and so found by the Board of Tax Appeals and the District Court, were concededly operated as a single interurban road, that there was a complete identity of control of the businesses, and that the joint operating expenses were arbitrarily apportioned. Defendant actually owned 70.9 per cent of the stock of the Ashtabula Company, and voted by means of solicited proxies, over 99 per cent of the stock that was voted at the annual meetings. This stock, however, constituted only 77 per cent to 84 per cent of the total issue,—which cannot be deemed "substantially all" of the sole class of stock issued by the subsidiary corporation, within the fair meaning of the Act.

We give no consideration to the proxy stock. Even if it might be thought that these proxies in this case constituted, *pro tanto*, such stock control as Sec. 240 (b) contemplates, yet, clearly, there was neither ownership nor control of any kind over the other 16 per cent to 23 per cent of voting stock. While the grant of proxies by some and the failure by others to vote at the annual meetings might be deemed an acquiescence in defendant's *economic control* of the Ashtabula Company, that in our judgment, and under the great weight of the decisions, does not suffice for affiliation.

We have carefully considered all of petitioners' contentions in connection with the facts (most of which were stipulated) and are of the opinion that the respondent did not err in holding that peti-

tioners were not entitled to file consolidated returns for the years in question. His determination on this point is, therefore, approved.

Regarding the second issue, the respondent concedes in his brief that the taxable income of the parent company for the year 1922, as determined by him, should be reduced by the amount in question for that year of $8,855.77. And as far as this issue relates to the year 1923, the parent company concedes in its brief that, if affiliation is denied, we do not have jurisdiction to consider it, for the reason that the respondent has determined no deficiency against the parent company for that year. Accordingly, since we have denied affiliation, we have no jurisdiction to consider this issue as far as it relates to the year 1923. *Cornelius Cotton Mills*, 4 B. T. A. 255.

The third issue is whether the respondent erred in including in the taxable income of the Light Company for the years 1922 and 1923 the respective amounts of $5,051 and $4,947.71 on account of the purchase by that petitioner of its own bonds at these amounts less than par. We have consistently held in a long line of decisions that where bonds are retired at less than issuing price, the obligor derives no taxable income from such transaction. See *Independent Brewing Co.*, 4 B. T. A. 870; and *Houghton & Dutton Building Trust*, 20 B. T. A. 591, and cases therein cited. The respondent's determination as to this issue is, therefore, reversed.

The fourth issue is whether, as a proposition of law, the subsidiary companies are entitled to a deduction for exhaustion, wear and tear of their physical properties which they had, several years previously, leased to the parent company for a term of 999 years with a condition in the lease that at the end of the term the properties, or their equivalent in value, be returned to the respective lessor in as good a condition as when leased. This issue remains by reason of the fact that we have denied the four petitioners an affiliation status under the statute. The facts and specific provisions of the respective leases which are material are set out in full in our findings.

It is now settled that in leases containing provisions similar to the ones here in question the *lessee* is not entitled to a deduction for exhaustion, wear and tear of leased property, payment for which has been made by the lessor. *Weiss* v. *Wiener*, 279 U. S. 333; 7 A. F. T. R. 8865. In that case Wiener was in the business of taking long leases of property and subletting. He held 13 leases for 99 years, renewable forever. He undertook to keep the buildings up to their present condition, and to pay rent even if the buildings were destroyed, such obligations being sanctioned by a liability to for-feiture. Wiener contended that because of these obligations he should be allowed a reasonable deduction for depreciation of such

property. In rejecting his contention, the Supreme Court said in part:

But it is very clear that as yet the capital of the lessee has not gone into it, and upon the considerations just mentioned it is not enough that he has made a contract that very possibly may not be carried out to replace that capital at some future time. If, as we think, such a contract is not enough to cause the lessee a present loss by wear and tear, the fact, which may be assumed, that the property was used by him in his business, does not matter. Of course he must show an interest in the property *and a present loss to him to make the statute apply.* (Italics supplied.)

Further on in its opinion the Supreme Court also said:

It does not matter that in Ohio, where the properties lie, these long leases are treated as in many respects like conveyances of the fee.

It is also settled that where the lessee covenants to maintain the property in as good condition as when taken over from the lessor, the lessee is entitled to a deduction for all capital items so made, spread over the life of the particular property or remaining term of the lease, whichever is shorter. *Duffy* v. *Central R. Co. of New Jersey*, 268 U. S. 55. In the latter case the lessee sought to deduct as a rental expense in the year in which made, certain expenditures for additions and betterments which it was obliged to make under the there existing lease. The Supreme Court ruled as follows:

In respect of the 999-year leases, the additions and betterments will all be consumed in their use by lessee within a fraction of the term, and, as to them, allowances for annual depreciation will suffice to meet the requirements of the statute. In the case of the pier leases, the improvements may and probably will outlast the term, and, as to them, deductions may more properly take the form of proportionate annual allowances for exhaustion.

The Supreme Court in the *Wiener* and *Central R. Co.* cases dealt with the problem as it affected the lessee. In the instant proceedings we are concerned with the question as it affects the lessor. In this connection the respondent has called our attention to our decision in *A. Wilhelm Co.*, 6 B. T. A. 1. In that case the taxpayer (a lessor) had leased its plant for five years with an option to the lessee to purchase the plant at any time within that period at a stated price, or at the termination of the lease to return the plant " in the same condition as the same now exists * * * the aggregate of which assets * * * shall be of at least as great book value and actual value when so returned as the aggregate of such assets as at present existing." It also appeared in that case that the lessee, during the taxable year there involved, made additions and replacements at a cost considerably in excess of the depreciation claimed by the lessor. In denying the lessor a deduction, we said:

The Revenue Act provides that in computing net income a deduction may be taken for a reasonable allowance for exhaustion, wear and tear. What is

a reasonable allowance must be determined from all of the facts and circumstances. In the peculiar circumstances here involved, considering that the lessee was bound to make good all depreciation by replacements or additions, it is our opinion that no allowance could be justified as reasonable.

It is argued on behalf of the petitioners in the instant proceedings that the *Wilhelm* case is distinguishable from their cases by reason of the term of the lease, the option granted, and the large improvements placed on the Wilhelm property by the lessee. While these may be distinguishing facts, we think it is true that the underlying legal principle is the same in both cases. The statute only permits the owner of property used in the business to take a " reasonable " deduction for exhaustion, wear and tear. When property is leased with a provision in the lease that it is to be maintained by the lessee and the same property or its equivalent in value returned to the lessor at the expiration of the lease in as good a condition and value as when leased, we believe that it would be contrary to the meaning of section 234 (a) (7) of the Revenue Act of 1921 to find that the lessor had actually suffered any loss deductible under that section, for, as said in *Weiss* v. *Wiener, supra,* he must show " a present loss to him to make the statute apply."

Petitioners further argue that to deny the lessor the right to take the deduction is to deny the deduction to any one, since it is settled that the lessee is not entitled thereto. But such a situation is more apparent than real. The lessor is denied the deduction because it has not and will not suffer any loss for the reason that the lessee has promised to make good any loss that might occur on account of exhaustion, wear and tear. And the lessee, when it makes good the loss, is entitled to deduct the entire amount so expended either in the year in which made (if an ordinary repair), or (if a capital item), over the life of the property replaced or remaining term of the lease, whichever is shorter. In that manner the lessee will have returned to it its entire cost of maintaining the property which it is entitled to deduct, and the lessor, at the end of the term, will receive back its property or its equivalent in value in as good a condition and value as when leased. It might be added that in making such a contract the lessor would naturally receive a less rental than if it had agreed to maintain the upkeep of the property itself.

Petitioners' position is that in leases of such long duration as the ones here in question, the proper application of section 234 (a) (7) should be to permit the lessor to deduct an amount commensurate with the actual exhaustion, wear and tear of the property until its entire capital sum has been so deducted and to include in the lessor's income at the end of the term the value of the property turned over to the lessor at that time. We do not think, however, that this posi-

tion gives full effect to the actual agreement existing between the lessor and lessee. The respective leases provided that the lessee would " during said term renew, repair and replace the same, so as to maintain and keep the demised premises in as good order, repair and condition as the same are now and in their present state of efficiency * * *." The presumption is that the parties will perform in accordance with their agreement. This being true, we do not think it would be reasonable to allow the lessor a deduction for exhaustion, etc., when such exhaustion was constantly being arrested by the lessee. We, therefore, hold to our decision in *A. Wilhelm Co.*, *supra*. The respondent's determination on this issue is sustained.

The fifth and final issue is whether the respondent erred in adding to the taxable income of each of the subsidiary companies for each of the years 1922 and 1923, respectively, the amounts of additional taxes determined by him for those years, which, if finally sustained, will be paid by the lessee. Petitioners admit, in view of the decisions of the Supreme Court in *Old Colony Trust Co.* v. *Commissioner*, 279 U. S. 716; and *United States* v. *Boston & Maine Railroad*, 279 U. S. 732, that the additional taxes, if finally sustained, will constitute " income " to the respective lessors; but resist the respondent's determination on the ground that since they are contesting the said additional taxes, such taxes can not " accrue " as income to the lessors until final adjudication has taken place. On the other hand, the respondent practically concedes in his brief that in view of our decision in *Providence & Worcester Railroad Co.*, 5 B. T. A. 1186, and other similar cases, his position can not be entirely sustained, and that instead of including the additional tax for 1922 in 1922 income, as the respondent has done, the Board will probably hold the additional tax for 1922 to be income for 1923, the year it became due and payable, and therefore, accruable. In the *Providence & Worcester* case we said:

The Commissioner has treated as income for each of the taxable years the amount of the tax which became due and was paid in the succeeding year. Under the decisions of the Board in the *Appeals of Russell Milling Co.*, 1 B. T. A. 194; *L. S. Ayers & Co.*, 1 B. T. A. 1135; and *Norwich & Worcester R. R. Co.*, 2 B. T. A. 215, this appears to have been in error. In the last cited case it was held that a tax which became due and was paid by the lessee in 1919 upon 1918 income was not income for 1918, since the tax did not accrue until 1919 and the income could not have accrued prior to 1919. This decision of the Board was followed in the United States District Court, District of Massachusetts, when suit was brought by the United States to recover the amount of tax disallowed by the Board in its decision. *United States* v. *Norwich & Worcester R. R. Co.*, 16 Fed. (2d) 944. Pursuant to those decisions the deficiency should be recomputed by including as income for 1921 the amount of the tax which became due and payable in that year upon 1920 income; * * *

Petitioners in their brief cite the case of the *American Telegraph & Cable Co.*, 2 B. T. A. 991, as standing for the proposition that " if the tax was paid by the guarantor on the original return it did not represent income accruing to the primary taxpayer *until the tax became due and payable* " which petitioners argue " in the instant proceedings would mean, that income would arise in the year and only in the year when a deficiency is *finally determined* to be due from the primary taxpayer " and that such meaning is confirmed in the instant proceedings by the last clause of article 10 of the respective leases set out in our findings.

We are unable to agree with petitioners that a tax does not become " due and payable " until it is finally determined. The several statutes specifically provide that the tax for a given taxable year becomes due and payable in the succeeding year. Section 250, Revenue Act of 1921; and section 270 of the Revenue Acts of 1924 and 1926. It is immaterial that the exact amount of the tax, if any, remains to be determined. The cited statutes further provide that, as soon as practicable after the return is filed, the Commissioner shall examine it, and if he finds that the taxpayer has overpaid the tax the excess shall be credited or refunded, and if he finds that the taxpayer has understated the tax, the deficiency, " together with interest thereon at the rate of one-half of 1 per centum per month *from the time the tax was due*," shall be paid upon notice and demand by the collector. And we think it immaterial that the respective leases provided that should the lessee contest the legality of a tax it should not be obliged to pay " until thirty days after final adjudication." The material provision is that regardless of when the exact amount of the tax, if any, is finally determined, the lessee is obliged to pay the tax, together with interest from the due date specified in the statute.

We, therefore, hold that the additional tax of each subsidiary for the year 1922 which the respondent included in the 1922 income should be eliminated therefrom and added to its income for the year 1923; and that the additional tax of each subsidiary for the year 1923 which the respondent included in the 1923 income should be excluded from such year's income.

*Judgment will be entered under Rule 50.*